UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------×
TREAD MAINES, BERNETTE BAILEY-MARSH,
RISHALLA GANPAT, *and* REBECCA ALEXANDRE,

        *Plaintiff,*

  v.

LAST CHANCE FUNDING, INC., *d/b/a* THE LCF
GROUP, and ANDREW PARKER, LAUREN IMMOOR,
and KRISTEN VAN WIE, *individually*,

        *Defendant.*
------------------------------------------------------------------------×

**17 CV 5453**

**SECOND AMENDED COMPLAINT**

Plaintiffs Tread Maines, Bernette Bailey-Marsh, Rishalla Ganpat, and Rebecca Alexandre (collectively, "Plaintiffs"), by their counsel, The Harman Firm, LLP, allege for their Second Amended Complaint against Defendants Last Chance Funding, Inc., d/b/a the LCF Group ("LCF"), Andrew Parker, Lauren Immoor, and Kristen Van Wie (collectively, "Defendants") as follows:

## PRELIMINARY STATEMENT

1. Plaintiff Maines seeks damages and costs against LCF for discriminating against him based on his race by terminating his employment, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq*., and Section 1981 of the Civil Rights Act of 1866 ("§ 1981"), 42 U.S.C. § 1981.

2. Plaintiff Bailey-Marsh seeks damages and costs against LCF for discriminating against her based on her race by terminating her employment, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq*., Section 1981 of the Civil Rights Act of 1866 ("§ 1981"), 42 U.S.C. § 1981, and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290 *et seq*.

1

3. Plaintiff Ganpat seeks damages and costs against Defendants for discriminating against her based on her race by subjecting her to a hostile work environment based on race, in violation of §1981 and the NYSHRL.

4. Plaintiff Ganpat also seeks damages and costs against Defendants for discriminating against her based on her race by terminating her employment, in violation of §1981 and the NYSHRL.

5. Plaintiff Alexandre seeks damages and costs against Defendants for discriminating against her based on her race by subjecting her to a hostile work environment based on race, in violation of § 1981 and the NYSHRL.

6. Plaintiff Alexandre also seeks damages and costs against Defendants for discriminating against her based on her gender by subjecting her to a hostile work environment, including sexual harassment, and terminating her employment, in violation of the NYSHRL.

**JURISDICTION, VENUE, AND ADMINISTRATIVE PREREQUISITES**

7. Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over Plaintiffs' claims arising under Title VII and § 1981.

8. Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over Plaintiffs' NYSHRL claims, as these claims are so related to the claims within such original jurisdiction that they form part of the same case or controversy.

9. Pursuant to 28 U.S.C. § 1391(b), venue is proper in the United States District Court for the Eastern District of New York, as a substantial part of the events giving rise to these claims occurred within this District.

10. All conditions precedent to maintaining this action have been fulfilled. Plaintiff Maines and Plaintiff Bailey-Marsh each filed charges of discrimination with the Equal

2

Employment Opportunity Commission ("EEOC"). The EEOC issued Right-to-Sue letters dated June 29, 2017, for Plaintiff Maines and August 21, 2017, for Plaintiff Bailey-Marsh relating to the discriminatory acts described in this Second Amended Complaint. This action was properly instituted for Plaintiff Maines and Bailey-Marsh within 90 days of the issuance of their respective Right to-Sue letters.

## TRIAL BY JURY

11. Plaintiff respectfully requests a trial before a jury.

## PARTIES

12. Plaintiff Maines, at all times relevant hereto, was and is a resident of Cobb County in the State of Georgia.

13. Plaintiff Bailey-Marsh, at all times relevant hereto, was and is a resident of Suffolk County in the State of New York.

14. Plaintiff Ganpat, at all times relevant hereto, was and is a resident of the State of New York.

15. Plaintiff Alexandre, at all times relevant hereto, was and is a resident of the State of New York.

16. Upon information and belief, at all times relevant hereto, Defendant LCF was and is a corporation organized under the laws of the State of New York with its principal place of business located at 411 Hempstead Turnpike, Suite 101, West Hempstead, New York 11552 in Nassau County.

17. Upon information and belief, LCF is a merchant cash advance company—a type of small business financing firm whose loan options are characterized by short payment terms

3

and small regular payments—which specializes in funding high-risk and hard-to-fund businesses.

18. During Plaintiffs' employment with LCF, LCF's total number of employees in the office in which Plaintiffs worked varied, ranging from as few as twelve at times to in excess of twenty at others, but generally exceeded fifteen.

19. Additional LCF Group employees worked in neighboring offices; as a result, LCF consistently employed more than twenty individuals during the period in question; many of these employees worked in both Plaintiffs' office and neighboring LCF offices.

20. Most LCF employees worked at the company's offices in West Hempstead. Some LCF employees, including Mr. Maines, worked remotely.

21. Upon information and belief, Defendant Parker resides in the State of New York and is the owner of LCF, located at 411 Hempstead Turnpike, Suite 101, West Hempstead, New York 11552 in Nassau County.

22. Upon information and belief, Defendant Inmoor is an employee of LCF and a resident of the State of New York.

23. Upon information and belief, Defendant Van Wie is an employee of LCF and a resident of the State of New York.

24. Plaintiff Maines commenced a bankruptcy action in the State of Georgia in and around 2014, prior to his employment with Defendants.

25. On or about March 1, 2018, Mr. Maines, through counsel, filed an Amended schedule listing the instant action as a potential asset.

4

## STATEMENT OF FACTS

**Plaintiff Tread Maines**

26. Mr. Maines is an African-American man.

27. Mr. Maines has several decades of experience in collections, risk management, and the merchant cash advance industry.

28. On or about February 1, 2017, LCF hired Mr. Maines, who resides in Georgia, to work remotely as its Director of Risk and Collections.

29. Throughout his employment at LCF, Mr. Maines was subjected to discrimination based on his race.

30. Prior to hiring Mr. Maines, LCF employed and/or contracted a white male, Mitchell Levy, in Mr. Maines's role; LCF paid Mr. Levy twice Mr. Maines's salary for essentially the same work.

31. LCF hired Mr. Maines because it believed, as an African-American, Mr. Maines would be "cheaper."

32. Mr. Maines was one of few African-American employees during his employment at LCF—another of whom (Ms. Bailey-Marsh, LCF's former Controller) was terminated during Mr. Maines's employment and replaced by Lauren Immoor, a white employee.

33. Defendant Andrew Parker (CEO), Ms. Immoor (Accountant, promoted to Controller after Ms. Bailey-Marsh's termination), and Kristen Van Wie (Director of Operations) treated Mr. Maines less well than white employees.

34. Ms. Van Wie reprimanded Mr. Maines for fabricated performance "deficiencies," such as failing to make over 100 calls in a single day, even though Mr. Maines had never been informed of any such expectation and, as Ms. Van Wie did not supervise Mr. Maines, she had no authority to reprimand him.

5

35. Ms. Immoor baselessly denied Mr. Maines access to information he needed to complete his job responsibilities, impairing his ability to perform his job responsibilities.

36. Ms. Inmoor and Ms. Van Wie did not treat their white co-workers in this manner.

37. As a result, Mr. Maines was discriminated against in the terms and conditions of his employment because of his race.

38. In and around late March 2017, Mr. Maines learned that his sister-in-law had died, and he emailed Mr. Parker to inform him that there had been a death in his family and to inquire about LCF's bereavement leave policy.

39. Shortly after Mr. Maines submitted this request, on or about March 30, 2017, Ms. Van Wie sent Mr. Maines an email, informing him that LCF was demoting him from Director of Collections and replacing him with Ms. Immoor, on the grounds that LCF was "not happy with the current state of affairs."

40. In reality, Defendants demoted Mr. Maines and promoted a white woman because of their discriminatory animus towards him.

41. Ultimately, Defendants terminated Mr. Maines's employment, at least in part, due to his race, in violation of Title VII and the NYSHRL.

**Plaintiff Rebecca Alexandre**

42. Ms. Alexandre, an African-American woman, was employed at LCF as an administrative assistant.

43. During her employment at LCF, Ms. Alexandre was sexually harassed by "Joe," a white male LCF employee.

6

44. Joe, on at least two occasions, subjected Ms. Alexandre to unwanted physical conduct, coming in to her office when no one else was around and rubbing her back and shoulders.

45. Joe continued to attempt to "massage" Ms. Alexandre, because he thought she seemed tense.

46. This conduct was extremely offensive and harassing to Ms. Alexandre, who had not invited such contact in any way.

47. As there is no formalized Human Resources (HR) function at LCF, Ms. Alexandre reported the harassment to Ms. Immoor after the second episode of unwanted touching.

48. Mr. Parker's response to Ms. Alexandre's report of sexual harassment was, "Why didn't she report it the first time?"

49. Joe is known to have harassed many women in the workplace.

50. Additionally, Joe had openly viewed pornography in the office, and was caught doing so by Ms. Van Wie.

51. Despite this, Defendants took no significant action against him.

52. Mr. Parker offered to speak with this employee but made the hostile work environment worse, as the perpetrator tried to apologize and continued to approach Ms. Alexandre.

53. Mr. Parker did not separate the two employees, did not conduct any sexual harassment or anti-discrimination training, and took no adverse actions against the white male perpetrator.

7

54. Between unwanted sexual contact and pornography in the workplace, Ms. Alexandre felt constantly wary because of her gender, and consistently needed to avoid Joe, who remained in the same area.

55. LCF has no formal HR procedures to prevent discrimination, harassment and retaliation which is rampant in the company.

56. In fact, Mr. Parker participated in discrimination against black employees and made discriminatory remarks.

57. For example, Mr. Parker and an LCF sales employee made discriminatory comments about the smell of Ms. Alexandre's lunch – Haitian food that Ms. Alexandre brings to the office.

58. When the sales employee came to see Mr. Parker, he said, "What is that stench you had texted me about?" mocking African American employees and their culture and food choices.

59. In front of Ms. Alexandre again, Mr. Parker and another White employee, Greg, expressed disbelief that the banks were closed for Martin Luther King Jr. day.

60. Mr. Parker responded by saying that it wasn't a "real" holiday and that he wouldn't close his business for it.

61. These were not isolated incidents; LCF's white employees regularly leveled stereotypical accusations at the African-American employees, such as suggesting that they used marijuana.

62. Ms. Alexandre also had difficulty in receiving compensation for her time worked.

63. As the clock systems are faulty at LCF, it did not always track employee time when clocking in and out.

8

64. Ms. Alexandre was forced to provide phone back up of work performed to receive $40 of missing pay, while White employees did not experience any similar abuse.

65. Unlike the African-American employees, White employees were not subjected to similar racially motivated comments and conduct.

**Plaintiff Bernette Bailey-Marsh**

66. Ms. Bailey-Marsh was employed with LCF from September 27, 2016, through February 24, 2017.

67. Prior to joining LCF, Ms. Bailey-Marsh had 20 years of experience in her own accounting practice with competency in preparing, examining, and analyzing accounting records, financial statements and financial reports; compiling financial statements and budgets; daily/monthly/annual accounting activities, preparing and filing individual, payroll, state, sales, partnership and corporate tax returns, and supervising employees.

68. Ms. Bailey-Marsh had represented accounting operations for organizations with over $2 million in revenue and up, saving her clients substantial amounts in sales tax audits, worked with 501(c)(3) organizations, handled corporate conversions and restructuring and is widely published including in Newsday.

69. Ms. Bailey-Marsh has a bachelor's of science degree in accounting from Long Island University.

70. Ms. Bailey-Marsh is proficient in Quickbooks, Sage/Peachtree, Microsoft Dynamics, Turbo Tax and ATX.

71. Ms. Bailey-Marsh is an African-American woman.

72. At LCF, Ms. Bailey-Marsh accomplished an IRS write off of $8,000 in payroll tax liability, internalized company payroll through ADP, prepared Form 1099s, worked on old

9

collection files, streamlined payment history on merchant accounts (payment history updated immediately once payments posted), and met with the CPA to start internalizing the organization's cash disbursements, cash receipts and bank reconciliations into their existing accounting system.

73. Ms. Bailey-Marsh was originally assigned to report to Mr. Parker.

74. In practice, Ms. Bailey-Marsh started to report to Ms. Immoor, a white woman who was originally assigned to be Ms. Bailey-Marsh's subordinate and has no accounting background or experience.

75. Ms. Bailey-Marsh was hired at a $70,000 annual salary, which LCF promised would be raised to $75,000 within 90 days of employment and $80,000 within 180 days of employment.

76. During Ms. Bailey-Marsh's first 90 days at LCF, at which time LCF had not yet hired Mr. Maines, LCF asked Ms. Bailey-Marsh to work on collection files.

77. After 90 days of positive work performance, Ms. Bailey-Marsh asked for her 90-day review to receive the promised raise.

78. In response, Mr. Parker said, "You are lucky to have a job," instead of making good on his promise.

79. Ms. Bailey-Marsh had met with LCF's company CPA, Yoel Wagschal, who felt that Ms. Bailey-Marsh was competent to handle the accounting department and that Mr. Parker would not need to hire another Chief Financial Officer.

80. Both Ms. Bailey-Marsh and Mr. Wagschal knew how to use Sage/Peachtree and had other accounting-specific knowledge, as they are both accomplished in the industry.

81. As Mr. Parker originally assigned Ms. Immoor to report to Ms. Bailey-Marsh, Ms. Bailey-Marsh requested that Ms. Immoor fill out timesheets to properly track her time.

82. Ms. Bailey-Marsh noticed that Ms. Immoor was missing important payments on merchant accounts and had very suspect overtime hours, claiming to be working on "Salesforce" at home in evenings and weekends, and also monopolized merchant accounts without progress.

83. Ms. Immoor never complied with this request or showed Ms. Bailey-Marsh her timesheets.

84. Ms. Bailey-Marsh was the most qualified African-American female employee in the company and noticed that other African-American employees were in more junior, administrative roles, whereas White employees were given much more authority, even where the White employees were less qualified than the African-American employees.

85. This reflected LCF's practice of hiring and promoting white employees over African-American employees.

86. Ms. Immoor, though junior to and less qualified than Ms. Bailey-Marsh, refused to cooperate with and report to her from the start.

87. Ms. Bailey-Marsh reported to Mr. Parker that Ms. Immoor refused to listen to her, even though Ms. Bailey-Marsh was the head of the department.

88. Although Mr. Parker promised to speak to Ms. Immoor, Ms. Bailey-Marsh believes he did not do so, and Ms. Immoor's conduct did not change.

89. Instead, LCF's white employees began to criticize Ms. Bailey-Marsh as "slow."

90. Eventually, Mr. Parker utilized another white employee, Ms. Van Wie, and Ms. Immoor to baselessly scrutinize on Ms. Bailey-Marsh's timesheet to terminate her.

11

91. Ms. Bailey-Marsh became sick on February 14 and February 15, 2017, due to the stress she was facing at work.

92. On or about February 24, 2017, Defendants terminated Ms. Bailey-Marsh's employment with pre-textual excuses about her timesheet.

93. Ms. Bailey-Marsh's job responsibilities were distributed to white employees.

94. Ms. Bailey-Marsh was a non-exempt senior employee who typically should have more authority over her own time and who had performed many advanced accounting/finance functions for the company.

95. This too is evidence of the undermining of a senior African-American female employee with extensive experience in accounting in favor of a White employee.

**Plaintiff Rishalla Ganpat**

96. Ms. Ganpat, an African-American woman, was hired to be a bookkeeper to support Ms. Bailey-Marsh and the accounting department.

97. However, Ms. Ganpat was only allowed to train with Ms. Bailey-Marsh for a few days before Ms. Immoor became angry and wanted to train Ms. Ganpat.

98. Subsequently, Ms. Ganpat was made to work only on Salesforce and basic data entry for Ms. Immoor, which was not the job she had accepted.

99. Once again, Defendants placed an African-American employee in a position subordinate to Whites.

100. Like Ms. Alexandre and Ms. Bailey-Marsh, Ms. Ganpat experienced Defendants' discriminatory biases first hand.

101. Subsequent to Ms. Bailey-Marsh's termination, Mr. Parker and Ms. Immoor told Ms. Ganpat that they would no longer hire Black employees due to Mr. Maines's complaint of discrimination.

102. In fact, when looking for collections and accounting prospective employees, Ms. Immoor would ask Ms. Ganpat, "Does this person sound Black?"

103. Defendants would run internet searches and background searches on prospective employees to determine their race.

104. Ms. Ganpat witnessed Defendants specifically reject potential employees because of their race; as a result, Ms. Ganpat worked under a constant cloud, knowing that Defendants did not want African-American employees such as herself.

105. Additionally, Mr. Parker and Ms. Immoor discussed openly that they would not advertise on Indeed and/or Craigslist in West Hempstead anymore because "there are too many African-American candidates there" and would instead advertise in a more "White" town.

106. Ms. Bailey-Marsh had found her job at LCF through a Craigslist posting in West Hempstead, although she lives in Suffolk County.

107. Ultimately, the same pre-textual excuses that Defendants used on Ms. Bailey-Marsh were used on Ms. Ganpat, who was subjected to specious criticism and written discipline.

108. White employees were not subjected to this type of treatment, and were allowed to flaunt workplace rules.

109. For example, African-American employees were required to document absences with a doctors' note, while white employees were not.

110. Ultimately, Ms. Ganpat was forced to resign because of this abuse as another African American woman.

13

# CAUSES OF ACTION
## FIRST CAUSE OF ACTION
### Wrongful Termination Based on Race in Violation of Title VII
(Plaintiffs Maines and Bailey-Marsh; Against Defendant LCF)

111. Plaintiffs hereby reallege and incorporate each and every allegation contained in paragraphs 1 through 110 with the same force as though separately alleged herein.

112. LCF is an employer as contemplated by Title VII, and Plaintiffs are employees as contemplated by Title VII.

113. Title VII prohibits an employer from discriminating against an employee in terms, conditions, or privileges of employment on the basis of race.

114. LCF discriminated against Plaintiffs Maines and Bailey-Marsh on the basis of their race by terminating their employments based on their race.

115. As such, LCF has violated Title VII.

116. As a direct and proximate consequence of LCF's race discrimination, Plaintiffs Maines and Bailey-Marsh have suffered, and continue to suffer, substantial damages, including,

117. but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

118. LCF's discriminatory treatment of Plaintiffs Maines and Bailey-Marsh was willful and/or in reckless disregard of Plaintiffs Maines and Bailey-Marsh's protected rights.

119. Accordingly, Plaintiffs Maines and Bailey-Marsh are entitled to an award of punitive damages against LCF.

## SECOND CAUSE OF ACTION
### Hostile Work Environment Based on Race in Violation of § 1981
(Plaintiffs Ganpat and Alexandre; Against All Defendants)

120. Plaintiffs hereby reallege and incorporate each and every allegation contained in paragraphs 1 through 119 with the same force as though separately alleged herein.

Case 2:17-cv-05453-ADS-ARL Document 51 Filed 10/11/18 Page 15 of 18 PageID #: 502

121. Section 1981 prohibits discrimination in a contractual relationship, such as employment, on the basis of race.

122. Defendants violated § 1981 by subjecting Plaintiffs Ganpat and Alexandre to a hostile work environment based on their race.

123. As a direct and proximate consequence of Defendants' race discrimination, Plaintiffs have suffered, and continue to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

124. Defendants' discriminatory treatment of Plaintiffs was willful and in reckless disregard of Plaintiffs' protected rights. Accordingly, Plaintiffs are entitled to an award of punitive damages against Defendants.

## THIRD CAUSE OF ACTION
### Wrongful Termination Based on Race in Violation of § 1981
### (Plaintiffs Maines, Bailey-Marsh, and Ganpat; Against All Defendants)

125. Plaintiffs hereby reallege and incorporate each and every allegation contained in paragraphs 1 through 124 with the same force as though separately alleged herein

126. Section 1981 prohibits discrimination in a contractual relationship, such as employment, on the basis of race.

127. Defendants violated § 1981 by terminating Plaintiffs' employments based on their race.

128. As a direct and proximate consequence of Defendants' race discrimination, Plaintiffs have suffered, and continue to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

129. Defendants' discriminatory treatment of Plaintiffs was willful and in reckless disregard of Plaintiffs' protected rights. Accordingly, Plaintiffs are entitled to an award of punitive damages against Defendants.

## FOURTH CAUSE OF ACTION
### Hostile Work Environment in Violation of the NYSHRL
### (Plaintiffs Alexandre and Ganpat; Against All Defendants)

130. Plaintiffs hereby reallege and incorporate each and every allegation contained in paragraphs 1 through 129 with the same force as though separately alleged herein.

131. The NYSHRL prohibits an employer from discriminating against an employee in compensation or in terms, conditions, and privileges of employment on the basis of race.

132. Defendants are employers as contemplated by the NYSHRL, and Plaintiffs are employees as contemplated by the NYSHRL.

133. Defendants violated the NYSHRL when they subjected Plaintiffs Alexandre and Ganpat to a hostile work environment based on their race.

134. As a direct and proximate consequence of Defendants' race discrimination, Plaintiffs have suffered, and continue to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

135. Defendants' discriminatory treatment of Plaintiffs was willful and/or in reckless disregard of Plaintiffs' protected rights. Accordingly, Plaintiffs are entitled to an award of punitive damages against Defendants.

## FIFTH CAUSE OF ACTION
### Wrongful Termination in Violation of the NYSHRL
### (Plaintiff Bailey-Marsh and Ganpat; Against All Defendants)

136. Plaintiffs hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 135 with the same force as though separately alleged herein.

16

137. The NYSHRL prohibits an employer from discriminating against an employee in compensation or in terms, conditions, and privileges of employment on the basis of race.

138. Defendants are employers as contemplated by the NYSHRL, and Plaintiffs are employees as contemplated by the NYSHRL.

139. Defendants violated the NYSHRL when they terminated Plaintiffs' employments based on their race.

140. As a direct and proximate consequence of Defendants' race discrimination, Plaintiffs have suffered, and continue to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

141. Defendants' discriminatory treatment of Plaintiffs was willful and/or in reckless disregard of Plaintiffs' protected rights. Accordingly, Plaintiffs are entitled to an award of punitive damages against Defendants.

## SIXTH CAUSE OF ACTION
### Hostile Work Environment Based on Gender in Violation of the NYSHRL
### (Plaintiff Alexandre Against All Defendants)

142. Plaintiffs hereby reallege and incorporate each and every allegation contained in paragraphs 1 through 141 with the same force as though separately alleged herein.

143. The NYSHRL prohibits an employer from discriminating against an employee in compensation or in terms, conditions, and privileges of employment on the basis of gender.

144. Defendants violated the NYSHRL when they subjected Plaintiff Alexandre to a hostile work environment based on her gender, including sexual harassment.

145. As a direct and proximate consequence of Defendants' gender discrimination, Plaintiff Alexandre has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

17

146. Defendants' discriminatory treatment of Plaintiff Alexandre was willful and/or in reckless disregard of Plaintiff Alexandre's protected rights. Accordingly, Plaintiff Alexandre is entitled to an award of punitive damages against Defendants.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests the following relief:

A. For the first cause of action, damages to be determined at trial;

B. For the second cause of action, damages to be determined at trial;

C. For the third cause of action, damages to be determined at trial;

D. For the fourth cause of action, damages to be determined at trial;

E. For the fifth cause of action, damages to be determined at trial;

F. For the sixth cause of action, damages to be determined at trial; and

G. For such other and further relief as the Court deems just and proper.

Dated:    New York, New York
          October 11, 2018

By:    s/ Walker G. Harman, Jr.
       Walker G. Harman, Jr.
       Edgar M. Rivera
       THE HARMAN FIRM, LLP
       381 Park Avenue South, Suite 1220
       New York, NY 10016
       (212) 425-2600
       wharman@theharmanfirm.com
       olaird@theharmanfirm.com

       *Attorneys for Plaintiff*